Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| JOSE A. LEDUC DEL VALLE<br>Recurrente<br><br>v.<br><br>MUNICIPIO DE SAN JUAN<br><br>Recurrido | TA2025RA00240 | ***Revisión Administrativa***<br>Procedente de la Comisión Apelativa del Servicio Público<br><br>Caso Núm. 2016-02-0936<br><br>SOBRE:<br> Retención (Destitución) |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Ronda Del Toro y la Jueza Lotti Rodríguez

*Grana Martínez, Jueza Ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 11 de marzo de 2026.

El recurrente José Leduc Del Valle solicita que revisemos la Resolución en la que la Comisión Apelativa del Servicio Público declaró no ha lugar su solicitud de apelación.

El recurrido Municipio de San Juan presentó su alegato en oposición al recurso.

I

Los hechos que anteceden a la presentación de este recurso son los siguientes.

El recurrente ocupaba el puesto de supervisor técnico de emergencias médicas en el Municipio de San Juan. Fue suspendido sumariamente, debido a un patrón de acoso y hostigamiento sexual contra la empleada y paramédica Josefa Álvarez Rosario. El municipio le informó detalladamente en la Carta de Formulación de Cargos cada uno de los incidentes de hostigamiento sexual en el empleo imputados y las normas de conducta infligidas. El recurrente pidió una vista que fue señalada. No obstante, previo a

la vista, la Oficial Examinadora citó a la víctima y a Suzette Vázquez Algarín y escuchó sus testimonios, conforme al inciso c de la sección 2 del art 3.07 del Reglamento para la Tramitación de los Procedimientos para la Formulación de Cargos, Código de Administración de Asuntos de Personal del Municipio de San Juan.

El 16 de diciembre de 2015 se realizó la vista informal ante la oficial examinadora. El recurrente asistió con su abogado, recibió copia de la prueba documental en el expediente y se le concedió tiempo para examinarla. Durante la vista presentó los testimonios a su favor de Omar Camacho, Yaritza Saltar Arroyo y Migdalia Figueroa Santiago. El recurrente también ofreció su testimonio. La oficial examinara incluyó todos los testimonios presentados en su informe. No obstante, encontró probados los cargos de hostigamiento sexual, debido a que no dio credibilidad al testimonio del recurrente. Según la oficial examinadora el recurrente; (1) estaba a la defensiva sobre su relación de supervisión con la víctima, (2) desconocía los hechos más básicos, como el momento a partir en que la víctima estuvo bajo su supervisión e, (3) incurrió en contradicciones. La Oficial Examinadora concluyó que el recurrente mintió y que los testimonios que presentó no aportaron nada a su defensa. Según la oficial examinadora los testigos del recurrente eran las personas que la víctima identificó como sus preferidos. El Municipio de San Juan informó por escrito al recurrente su destitución.

El recurrente apeló su destitución ante la Comisión Apelativa de Servicio Público. El señor Leduc alegó que; (1) el municipio realizó un procedimiento atropellado, irregular y prejuiciado, (2) la formulación de cargos y la resolución final las suscribieron personas distintas a la autoridad nominadora, (3) las determinaciones de hechos eran imprecisas e incorrectas, (4) se violaron sus derechos al debido proceso de ley, presentar evidencia

a su favor, a una adjudicación imparcial y a una decisión basada en el expediente, y que, (4) la Oficial Examinadora entrevistó y escuchó a los testigos de cargo en su ausencia, lo privó de poder contrainterrogarlos y a la querellante y a sus testigos le dio oportunidad de subsanar, ampliar y refutar sus alegaciones y defensas en su ausencia.

El municipio alegó que despidió al recurrente porque cometió un patrón de hostigamiento sexual en el empleo y negó las violaciones al debido proceso de ley.

La Comisión Apelativa realizó una vista en sus méritos donde se presentaron como evidencia las declaraciones escritas de Josefa Álvarez, Carmen Ferrer, Ivelisse Ribera Lebrón, Carlos Pérez Guzmán y Suzette Vázquez Algarín, así como la carta de destitución. El oficial examinador incluyó textualmente en su informe las declaraciones escritas de los testigos y un resumen de lo que los testigos declararon en la vista administrativa.

El oficial examinador determinó probados los hechos a continuación. El promovente trabajaba en el Municipio de San Juan como Supervisor Técnico de Emergencias Médicas adscrito a la Oficina para el Manejo de Emergencias Administración de Desastres y Emergencias Médicas. El 31 de agosto de 2009 fue suspendido durante cinco días laborables de empleo y sueldo, porque se quedó dormido en el área de trabajo y usó inadecuadamente el tiempo laborable. El 30 de octubre de 2015 fue suspendido de empleo por hostigamiento sexual, sin embargo, continúo recibiendo su salario. El 16 de diciembre de 2015 el municipio realizó una vista informal. El promovente asistió a la vista y tuvo oportunidad de ser oído. No obstante, el 18 de noviembre de 2015, la Oficial Examinadora entrevistó a las señoras Josefa Álvarez Rosario y Suzette Vázquez

Algarín en ausencia del promovente y de su representación legal. El 4 de febrero de 2016 el recurrente fue notificado de su destitución.[1]

Según el oficial examinador el recurrente incurrió en la conducta siguiente. Durante el mes de abril de 2014 se acercó a la señora Álvarez Rosario y la invitó a salir después de su turno. Durante el mes de noviembre de 2014, agarró y frotó la mano de la señora Álvarez Rosario y le escribió varios mensajes de texto para que lo llamara. La señora Álvarez Rosario le expresó su inconformidad y le retiró la mano abruptamente mientras lo miraba seria y de forma molesta. Durante el mes de enero de 2015 le preguntó a la señora Álvarez Rosario y a la empleada Suzette Vázquez Algarín, si eran pareja. La señora Álvarez manifestó su inconformidad alejándose sin responder. Durante las fiestas de la Calle San Sebastián del año 2015 le insinuó a la señora Álvarez Rosario que se buscara un chillo, mientras iban en un vehículo oficial junto a varios empleados en un vehículo. La señora Álvarez Rosario no pudo contener su enojo y le dijo en tono molesto y alto que estaba felizmente casada. Durante el mes de febrero de 2015 el recurrente le dijo a la señora Carmen Ferrer que la señora Álvarez Rosario era una cabrona. El 27 de julio de 2015 el recurrente se acercó por detrás de la señora Álvarez Rosario y la rozó con su área púbica, mientras se encontraba trabajando en el Residencial Las Margaritas. Durante el mes de octubre de 2015 el recurrente se paró frente al automóvil de la señora Álvarez Rosario de forma intimidante, a pesar de que el 24 de mayo de 2015 fue instruido a no interactuar con ella. La señora Álvarez Rosario estaba dentro de su vehículo. El recurrente abandonó el área, cuando observó a la señora Vázquez Algarín acercarse en su automóvil al

---

[1] Véase Resolución, Informe Oficial Examinadora, Anejo Núm. 2, determinaciones de hechos 1-6.

estacionamiento. Desde el 27 de octubre de 2014 al 21 de diciembre de 2014, el recurrente mantuvo a la señora Alvarado sin un fin de semana libre, a pesar de que no podía excederse de cinco fines de semana. Del 1 de febrero de 2015 al 18 de abril de 2015 la mantuvo nuevamente sin disfrutar un fin de semana libre.[2]

El oficial examinador concluyó que el municipio probó mediante prueba clara, robusta y convincente que despidió al recurrente conforme a derecho. La funcionaria dio entera credibilidad al testimonio de la víctima durante la vista en sus méritos. Según el oficial examinador los testimonios de Carmen Font, Ivelisse Rivera Lebrón, Carlos Pérez Guzmán, Suzette Vázquez Algarín y Maria L Colón Pérez confirmaron su versión de los hechos. El funcionario concluyó que el recurrente incurrió en un patrón de hostigamiento sexual y continúo acercándose a la víctima luego de tenerlo prohibido. Al oficial examinador le quedó claro que el recurrente violentó las normas de conductas del municipio porque; (1) continúo acercándose a la vista a pesar de tenerlo prohibido, (2) rozó a la víctima en la mano mientras la saludaba y con la hebilla de su correa, mientras estaba sentada en una camilla, (3) hizo comentarios de índole sexual a la víctima porque le cuestionó si era pareja de Suzette Vázquez Algarín y le dijo que buscara un chillo, (4) se refirió en varias ocasiones de forma grosera irrespetuosa, ofensiva y amenazante sobre la víctima a la que llamó cabrona y, (5) provocó miedo y nervios a la víctima porque se paró frente su vehículo de manera intimidante.

Según el oficial examinador determinó que una primera falta de insubordinación ameritaba una suspensión de empleo y sueldo de 10 días. No obstante, advirtió que el recurrente fue sancionado

---

[2] Véase Resolución, Informe Oficial Examinadora, Anejo Núm. 2, determinación de hecho 7.

previamente por esa causa. El funcionario justificó la destitución, a pesar de que una primera falta por hostigamiento sexual solo conllevaba una suspensión de empleo y sueldo de 10 días. Su determinación estuvo basada en la totalidad de las circunstancias y los testimonios que demostraron que era una conducta habitual del recurrente. La prueba presentada convenció al oficial examinador de que el recurrente se comportaba de esa forma, sobre todo con las empleadas transitorias, cuya vulnerabilidad en el empleo era mayor. El oficial examinador además se convenció de que el recurrente ejercía un acoso constante hacia la víctima que atentaba contra su intimidad.

Por otro lado, no dio crédito a las alegaciones de que la oficial examinadora del municipio violentó el debido proceso de ley del recurrente, porque entrevistó a la víctima y a una testigo en su ausencia. El oficial examinador concluyó que el derecho del recurrente a una vista informal no incluía la confrontación de testigos. El funcionario resolvió que el municipio salvaguardó el debido proceso de ley del recurrente, porque le informó detalladamente la conducta imputada y se le dio la oportunidad de ser oído y ofrecer su versión de los hechos.

La Comisión Apelativa del Servicio Público acogió el informe de la Oficial Examinadora y declaró no ha lugar la apelación.

Inconforme, el recurrente presentó este recurso en el que alega que:

> Erró la CASP al realizar determinaciones de hecho basadas en el contenido de la Formulación de Cargos y la Resolución Final de la PROMOVIDA RECURRIDA y no en la totalidad del expediente obrante ante sí.

> Erró la CASP al validar como correcto lo actuado por la PROMOVIDA RECURRIDA durante la vista administrativa informal del PROMOVENTE RECURRENTE ante el Municipio, incumpliendo su función revisora y avalando una crasa violación al debido proceso en su vertiente procesal.

Erró la CASP en su interpretación y aplicación del derecho sustantivo, al confirmar una medida disciplinaria que no está en sintonía con la norma estatutaria establecida por el Reglamento de Disciplina Progresiva adoptado por el PROMOVIDO RECURRIDO Municipio de San Juan.

II

## LA REVISIÓN JUDICIAL CUANDO SE IMPUTAN

## VIOLACIONES ÉTICAS.

Tan reciente como en *Oficina de Ética Gubernamental v. Diaz Atienza,* 2025 TSPR 128, el Tribunal Supremo de Puerto Rico ratificó las pautas que rigen la revisión judicial de las decisiones provenientes de los organismos administrativos. Explicó que conforme lo dispuesto en la sección 4.5 de la Ley Núm. 38-2017[3] el alcance de la revisión por el tribunal revisor se resume en tres pasos, estos son. Primeramente, conceder el remedio apropiado, si determinan que el recurrente tiene derecho a alguno, segundo, sostener las determinaciones de hecho si se basan en evidencia sustancial que obra en el expediente administrativo y, por último, revisar las conclusiones de derecho en todos sus aspectos. La evidencia sustancial es el quantum de prueba requerido para las determinaciones de hecho. El Tribunal Supremo de Puerto Rico ha definido la evidencia sustancial como la prueba que una mente relevante razonable podría aceptar como adecuada para sostener una conclusión.

La decisión de la agencia debe estar basada exclusivamente en el expediente administrativo. La revisión judicial también debe regirse al expediente de la agencia. El alcance de la revisión judicial está limitado a instancias donde: (1) la determinación administrativa no está basada en evidencia sustancial, (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que

---

[3] Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38 de 30 de junio de 2017, según enmendada.

se le ha encomendado administrar, (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional o, (4) la actuación administrativa lesionó derechos constitucionales fundamentales. *Oficina de Ética Gubernamental v. Diaz Atienza, supra., Super Asphalt v. AFI y otro,* 206 DPR 803, 819 (2021).

Como norma general, la preponderancia de la prueba es el quantum de prueba necesario para prevalecer en el ámbito administrativo. No obstante, el Tribunal Supremo ha aplicado un estándar distinto en los procedimientos que involucran violaciones éticas, entendiendo que debido a que su naturaleza cuasi-penal, amerita una evaluación más rigurosa. El máximo foro local adoptó un análisis distinto, porque en esos casos el funcionario público está sujeto a multas cuantiosas, suspensión de empleo y sueldo o en el peor de los escenarios, la destitución o el despido del cargo público. Según el Tribunal Supremo de Puerto Rico tales sanciones repercuten en el derecho del funcionario público a ganarse el sustento. *Oficina de Ética Gubernamental v. Diaz Atienza, supra; OEG v. Martínez Giraud,* 210 DPR 79, 93 (2022).

La prueba en los procedimientos disciplinarios en el foro administrativo se aquilata a la luz del estándar de prueba clara, robusta y convincente. Se trata de un estándar intermedio más exigente que el de preponderancia de la prueba usado en los casos civiles y, menos riguroso que el de más allá de duda razonable aplicable en la esfera criminal. La prueba clara robusta y convincente no puede definirse de forma precisa. No obstante, es aquella evidencia que produce en el juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probables. Dicho estándar exige superar y descartar planteamientos basados en conjeturas y en relatos de terceros. *Oficina de Ética*

*Gubernamental v. Diaz Atienza, supra, OEG v. Martínez Giraud, supra.*, págs. 93-94.

## LA COMISIÓN APELATIVA DEL SERVICIO PÚBLICO

La Comisión Apelativa del Servicio Público es un organismo cuasi judicial de la Rama Ejecutiva especializado en asuntos obrero-patronales y el principio del mérito. Su función es atender casos laborales, de administración de recursos humanos y las querellas de empleados. 3A LPRA Ap. XIII, Artículo 4. El legislador le concedió facultad para conceder indemnizaciones por daños e imponer multas administrativas en todo tipo de discrimen. 3A LPRA Ap. XIII, Art. 8 (j). La Comisión tendrá jurisdicción exclusiva sobre las apelaciones surgidas como consecuencia de acciones o decisiones de los administradores individuales y los municipios en las circunstancias que especifica la ley. 3A LPRA Ap. XIII, Artículo 12.

## LA VISTA INFORMAL EN EL PROCEDIMIENTO ADMINISTRATIVA Y LAS GARANTÍAS MÍNIMAS DEL DEBIDO PROCESO DE LEY

La reciente opinión del Tribunal Supremo de Puerto Rico en *Katirias Café v. Mun. de San Juan,* 2025 TSPR 33, 215 DPR___ (2025) ratifica que el procedimiento administrativo tiene que ser justo y equitativo. No obstante, dependiendo de las circunstancias y de diversas situaciones pueden requerir diferentes tipos de procedimientos, pero el proceso gubernamental siempre debe ser justo e imparcial. El debido proceso de ley garantiza a los trabajadores gubernamentales una vista informal previa a su destitución. *Domínguez Castro et al. v. ELA I,* 178 DPR 1, 48 (2010). Los requisitos procesales de la vista informal son los siguientes: (1) notificación escrita al afectado de los cargos y el curso de acción específico en su contra, (2) una descripción de la prueba que posee el patrono y, (3) oportunidad de responder a los cargos y expresar su versión de los hechos, (4) la vista no debe ser compleja,

complicada, extensa o formal. *Marrero Caratini v. Rodríguez Rodríguez,* 138 DPR 215, 222-223 (1995); *Torres Solano v. PRTC,* 127 DPR 499, 527 (1990).

Como anticipamos, la vista informal no debe ser compleja, complicada, extensa o formal. Únicamente es necesario que el empleado tenga la oportunidad de explicar personalmente o por escrito las razones por las que entiende no debe ser disciplinado. El empleado público tiene derecho a una notificación escrita de los cargos en su contra. El propósito de la vista es evitar que una persona sea privada de su sustento diario, debido a una decisión errónea. La vista debe servir como un escrutinio mínimo inicial para determinar, si existe justificación razonable para creer que los cargos contra el empleado son ciertos y que el curso de acción a seguirse está justificado. *Torres Solano v. PRTC,* supra, págs. 526-527.

Por otro lado, el Municipio de San Juan adoptó mediante la Ordenanza Núm. 27, Serie 2001-02 el Código de Administración de Asuntos de Personal. El Capítulo III de dicho código contiene el Reglamento para la Tramitación de los Procedimientos de Formulación de Cargos y de Vistas Administrativas Informales de los Empleados de Servicio de Carrera y Transitorios del Municipio de San Juan. La vista informal se define como la audiencia informal ante el oficial examinador en la cual el empleado o funcionario tiene derecho a ser escuchado y refutar las imputaciones notificadas en la formulación de cargos. Artículo 406 P del Reglamento de Conducta y Medidas Disciplinarias del Municipio de San Juan contenido en el Capítulo IV del Código de Administración de Asuntos de Personal.

Según lo dispuesto en el Artículo 3.06 (a) (c) del Reglamento para la Tramitación de los Procedimientos de Formulación de Cargos y de Vistas Administrativas Informales de los Empleados del Servicio

Público, *supra,* todo empleado notificado de la intención de destituirlo, cesantearlo o suspenderlo de empleo y sueldo, tendrá derecho a una vista administrativa informal de formulación de cargos. La vista será presidida por un examinador. El empleado podrá presentar su versión de los hechos y las defensas que entienda pertinentes.

Por su parte el Artículo 3.07 (d) consagra el derecho de un empleado notificado de la intención de ser destituido, cesanteado o suspendido a; (1) recibir una notificación escrita de los cargos administrativos, (2) recibir una descripción de la prueba que posee la autoridad nominadora para sostener su intención y, (3) oportunidad de ser oído y brindar su versión de lo sucedido de manera oral o por escrito. Durante la vista informal no aplican las reglas de evidencia, el Oficial Examinador leerá la carta de formulación de cargos disciplinarios administrativos o la intención de cesantía en presencia del empleado y permitirle a este explicar oralmente o por escrito las razones por las que no debe ser disciplinado. El oficial examinador hará su informe luego de escuchar la versión del empleado y de examinar la totalidad de la prueba.

EL HOSTIGAMIENTO SEXUAL EN EL EMPLEO

La prohibición de hostigamiento sexual en el empleo tiene su origen en la protección constitucional a la dignidad del ser humano y a la prohibición de discrimen por sexo. *Casillas Carrasquillo v. ELA,* 209 DPR 240, 249 (2022); *Rosa Maisonet v. ASEM,* 192 DPR 368, 379 (2015). El legislador aprobó la Ley Para Prohibir el Hostigamiento Sexual en el Empleo para poner en vigor el mandato constitucional.[4] Esta legislación reconoce el hostigamiento sexual en el empleo como una modalidad del discrimen por sexo. El legislador

---

[4] Ley Núm. 17 del 22 de abril de 1988, según enmendada, 29 LPRA 155 et seq.

dispuso en su Exposición de Motivos que el hostigamiento sexual en el empleo atenta con la dignidad del ser humano, constituye una acción discriminatoria en el campo laboral, obstaculiza la labor de la persona y la priva del goce y disfrute de la vida plena a la que tiene derecho todo ser humano. *Rosa Maisonet v. ASEM, supra,* pág. 380.

El hostigamiento sexual en el empleo puede ocurrir de dos formas distintas. La primera es el llamado *quid pro quo* que ocurre cuando se afectan los beneficios tangibles del empleo, debido a sostenimiento o rechazo de los avances o requerimientos sexuales. La segunda modalidad es el hostigamiento por ambiente hostil y se trata de la ocurrencia de una conducta sexual no deseada que interfiere irrazonablemente con el sano desempeño en el trabajo y que redunda en un ambiente ofensivo. 29 LPRA sec. 155 (b); *Rosa Maisonet v. ASEM, supra,* pág. *381.*

La Ley de Municipios Autónomos, vigente para la fecha de los hechos, prohibía expresamente el hostigamiento sexual en el empleo. 21 LPRA sec. 4561(b)(9). El 24 de agosto de 2001 el Municipio de San Juan adoptó el Reglamento sobre Hostigamiento Sexual en el Empleo, mediante la Orden Ejecutiva Núm. JS 007, Serie 2001-2002 en cumplimiento con la política pública del Estado.

El Reglamento de Conducta y Medidas Disciplinarias del Municipio de San Juan, *supra,* establece la norma general de que las medidas disciplinarias se impondrán de manera progresiva, según lo dispuesto en las Normas de Conducta y Medidas Disciplinarias y conforme el empleado incurra o reincida en las infracciones durante el periodo de vigencia de las medidas disciplinarias. Artículo 4.14 E. No obstante, dichas normas son una guía de acción correctiva. Artículo 4.09. Por su parte, el Artículo 4.10 contiene los criterios a considerar a la hora de imponer medidas disciplinarias. Algunos de estos criterios son los siguientes.

La gravedad de la falta o violación a las normas o leyes establecidas, la acumulación de violaciones o sanciones previas, daños causados a algunas personas o propiedad o los daños que pudieron haber causado, grado de peligrosidad para la salud a la seguridad pública, la violación ocurre en horas laborables y dentro de las facilidades del municipio y si afecta o puede afectar adversamente la moral o el buen nombre del municipio y sus empleados.

III

Los errores señalados son los siguientes: el recurrente alega que la confirmación de su destitución no está basada en prueba robusta y convincente y cuestiona la credibilidad que la Comisión Apelativa dio a la víctima. Su representación legal argumenta que fue privado del debido proceso, porque la oficial examinadora del municipio entrevistó a la víctima y a Suzette Vázquez en su ausencia. El recurrente reclama el derecho a impugnar esos testimonios. Por último, alega que la destitución no procede porque no está contemplado en caso de una primera infracción. El recurrente alega en el segundo señalamiento de error que la CASP validó que la oficial del municipio entrevistara a la víctima y a una testigo en su ausencia, y que no se le permitiera contrainterrogarlas durante la vista informal. Su representación legal aduce que el recurrente tenía derecho a carearse con ambos testigos durante la vista informal.

El recurrente no tiene razón, porque no existe derecho a contrainterrogar a los testigos en la vista informal. El derecho al debido proceso de ley, durante la vista informal se circunscribe a; (1) recibir una notificación escrita de los cargos y el curso de acción en su contra, (2) conocer la prueba del patrono, y (3) tener oportunidad de responder a los cargos y expresar su versión de los hechos.

El Municipio de San Juan cumplió con todas las garantías del debido proceso de ley, porque envió al recurrente una carta de formulación de cargos en la que fue notificado, debida y detalladamente sobre los hechos específicos de hostigamiento sexual que se le imputaban; del nombre de la víctima; de las disposiciones de ley que alegadamente violentó y, de la vista administrativa informal en la que tendría oportunidad de exponer las razones por las que no procedía la destitución.

El procedimiento seguido en la vista informal fue justo y equitativo porque el recurrente; (1) compareció junto a su abogado, (2) tuvo oportunidad de prestar su versión de los hechos, (3) recibió una descripción de la prueba documental y copia de esta y, (4) tuvo tiempo para examinar la prueba documental antes del comienzo de la vista. Además, el procedimiento ante la Comisión Apelativa también cumplió con las garantías del debido proceso. La Comisión evaluó nuevamente la totalidad de la prueba documental que estuvo ante la consideración del municipio, incluyendo las declaraciones de la víctima y de otros testigos. El foro recurrido realizó una vista formal en la que escuchó y vio a todos los testigos declarar. El señor Leduc compareció a esa vista con su abogado, escuchó y vio a todos los testigos declarar y tuvo la oportunidad de contrainterrogarlos.

Por otro lado, el recurrente cuestiona en el primer señalamiento de error la credibilidad que la Comisión Apelativa dio al testimonio de la víctima y alega que su decisión no está basada en prueba robusta y convincente.

La representación legal del recurrente se equivoca. La resolución recurrida satisface el estándar de prueba clara, robusta y convincente aplicable a los procedimientos disciplinarios. La decisión no está basada en conjeturas ni en relatos de terceros. Por el contrario, se sostiene en los testimonios creídos y no

controvertidos de la víctima y de los testigos que presenciaron el hostigamiento sexual del recurrente contra la señora Álvarez.

El testimonio creíble y no controvertido de la señora Josefa Álvarez Rosario probó el patrón de hostigamiento sexual en el empleo al que la sometió el recurrente. Su testimonio fue el siguiente. El recurrente fue su supervisor durante el año 2014.[5] Al principio guardó silencio sobre los incidentes de hostigamiento sexual, pero luego decidió querellarse en Recursos Humanos.[6] A finales de abril de 2014, el recurrente se le acercó y la invitó a salir. Ella le contestó que no. El incidente no fue presenciado por otras personas porque estaban solos. La invitación la asombró, porque el recurrente era un supervisor y ella acababa de llegar. Nunca lo reportó a recursos humanos, porque tenía miedo.[7] Luego de ese incidente, el recurrente se negó a entregarle las llaves de la base, con la excusa de que era nueva y se vio obligada a buscarlas en la oficina. El incidente ocurrió en presencia de Carlos Lozano y Víctor Alicea.[8] Al cabo de dos o tres días, le pidió al director de operación, Ernesto Castro que la cambiara de base.  El señor Castro autorizó su cambio a la base cuatro.[9] Al poco tiempo ella estuvo casi cinco meses fuera del trabajo por enfermedad. [10]

A su regreso, fue reasignada a la base central, bajo la supervisión del recurrente.[11] La víctima declaró que el recurrente comenzó nuevamente un patrón de hostigamiento sexual en su contra. Su testimonio fue el siguiente. Cuando le extendió la mano para saludarlo, el recurrente le arrascó la palma de la mano. Ella entendió que la actuación del recurrente tenía una connotación

---

[5] Véase entrada número 8 ante el TA, Anejos, pág. 24 de la transcripción de la señora Álvarez.
[6] Id, pág. 25.
[7] Id, págs. 28, 30-31.
[8] Id, pág. 28.
[9] Id, pags. 29, 31-32.
[10] Id, págs. 32-33.
[11] Id, pág. 33.

sexual, se sintió mal y retiró la mano abruptamente. El recurrente no le dijo nada y ninguna otra persona presenció el incidente.[12] Se sintió mal, porque estuvo de cuatro a cinco meses fuera del trabajo por enfermedad y al regresar se topó con que el recurrente era nuevamente su supervisor y que volvió a hacerle acercamientos sexuales no deseados.[13] No reportó el suceso, porque no estaba preparada, debido a que su tratamiento médico no había concluido y necesitaba salir de la situación de salud que estaba pasando.[14] Otro de los incidentes de hostigamiento sexual en el empleo ocurrió para finales de noviembre y más o menos en diciembre. El recurrente empezó a enviarle mensajes de texto que decían *call me*. Además, la llamaba a altas horas de la noche y de madrugada y mientras estaba descansando. Ella no le contestaba, porque no era usual que los supervisores llamaran por la noche y fuera de horas laborables.[15] Aunque admitió que no tenía los mensajes, porque cambió el teléfono, explicó que los presentó en recursos humanos cuando hizo la querella.[16]

Otro incidente narrado por la víctima fue el siguiente. Durante las fiestas de la Calle Sebastián iba en un vehículo conducido por el recurrente. Otros compañeros iban de pasajeros, porque se dirigían a la oficina a ponchar. Durante el viaje el recurrente le dijo que solamente faltaba ella de conseguirse un chillo. Ella le contestó que estaba felizmente casada en un tono molesto para advertirle que no siguiera.[17] La conducta del recurrente le molestó desde el principio, pero su constancia, ya la estaba sacando. Aunque pensó que desistiría si se quedaba callada, el recurrente continúo hostigándola. El incidente en el vehículo ocurrió en presencia de

---

[12] Id, págs. 34-35.
[13] Id, pág. 35.
[14] Id, pág. 36.
[15] Id, págs. 36-37.
[16] Id, pág. 38.
[17] Id, pág. 39.

Carlos Pérez.[18] Ella no informó el incidente a sus supervisores, porque el recurrente tenía muy buena amistad con la administración y en específico con el señor Castro.[19]

La víctima declaró sobre otro incidente de hostigamiento sexual en el empleo que ocurrió en presencia de Suzette Vázquez, a quien se refirió como una muy amiga suya.[20] El incidente ocurrió en el área del ponchador. El recurrente se acercó a ambas para preguntarle si eran del ambiente, o sea si eran lesbianas. Aunque no le respondió nada, sintió coraje, frustración y discriminación, porque le preguntó sobre sus preferencias sexuales.[21] Durante los meses de enero y febrero empezó a notar cambios en sus horarios. El recurrente era el encargado de sus horarios y no le estaba concediendo un fin de semana libre al mes, como era costumbre. Ella le informó la situación a la líder del grupo y le pidió que verificara. La líder del grupo le dijo que iba a investigar.[22]

La señora Álvarez dijo que Carmen Ferrer le contó que el recurrente se refirió a ella como cabrona en su presencia y de otros compañeros. Según la víctima comenzó a buscar ayuda para finales de febrero y principios de marzo, principalmente, luego de que la señora Ferrer le contara como el recurrente se expresaba sobre su persona. La señora Álvarez declaró que cuestionó al recurrente y él le contestó sínicamente que era una cabrona.[23] Según la víctima ese incidente ocurrió para marzo de 2015 y nadie más estuvo presente.[24] La señora advirtió que Jason Díaz también le dijo que el recurrente decía que era una cabrona y puerca y que no servía como mujer.[25] Ella llamó al Director de Manejo de Emergencias y le dijo que el

---

[19] Id, págs. 40 a 41.
[20] Id, pág. 41.
[21] Id, págs. 42-43.
[22] Id, págs. 44 45.
[23] Id, pág. 46.
[24] Id, págs. 46 y 48.
[25] Id, pág. 48.

recurrente la invitó a salir, la llamaba cabrona y puerca frente a otros empleados y decía que no servía como mujer. Además, le dijo que el recurrente le cambió los horarios.[26] El señor Nazario la instruyó a hacer un informe y a reunirse al día siguiente con el señor Machuca y la representante de recursos humanos, Viveca Bosh. La víctima dijo que el recurrente fue trasladado a otra base como a los tres días. El recurrente fue trasladado para el mes de marzo de 2015.[27] Sin embargo, continuó yendo a su base de trabajo y durante sus turnos y se estacionaba a su lado. Ella le llevó a la señora Bosh las fotos del vehículo del recurrente estacionado a su lado.[28] Sin embargo, la señora Bosh le dijo que el recurrente tenía que ir a hacer cosas oficiales y ahí se quedó el asunto.[29]

Durante su testimonio la señora Álvarez declaró que se sentía incómoda y llegaba a los turnos nerviosa, porque no sabía si el recurrente le iba a hacer otro acercamiento sexual. Además, se sentía mal como mujer, porque no entendía como su supervisor se podía expresar de esa manera.[30] La señora Álvarez narró otro incidente que ocurrió para el mes de mayo. La víctima dijo que fue a buscar unos uniformes. El recurrente estaba en el área del parking y cuando la vio se rio en su cara burlonamente. Ella entendió que se estaba burlando, porque continuaba molestándola y no había pasado nada a pesar de que hizo una querella en su contra.[31] Por último, la señora Álvarez declaró sobre otro incidente de conducta sexual no deseada, que el recurrente realizó para el mes de junio o de julio. El recurrente se le pegó por la parte de atrás. Ella sintió que la rozó por la espalda con la correa de su pantalón, su área púbica y su pipa.[32] Además, pensó que, si hizo eso en presencia de otros,

---

[26] Id, págs. 52-53.
[27] Id, págs. 54-55.
[28] Id, págs. 54 a 56.
[29] Id, pág. 56.
[30] Id, pág. 53.
[31] Id, pág. 57.
[32] Id, págs. 57-59.

se atrevería a violarla si estaba sola.[33] La señora Ivelisse Rivera vio el incidente y la abordó por si quería querellarse.[34] La representación legal del recurrente contrainterrogó a la víctima. No obstante, no pudo minar su testimonio. La víctima fue consistente en que el recurrente se negó a entregarle las llaves de la base, luego de que no quiso salir con él. Fue enfática en que los supervisores se comunican con los empleados en horas viables y durante el día, en alusión a las llamadas y mensajes del recurrente.[35]

El testimonio de Carmen Ferrer confirmó que escuchó al recurrente referirse a la señora Álvarez como cabrona. La testigo dijo que escuchó a otra compañera decirle al recurrente que había que estar pendiente de que no hiciera lo mismo que en la otra ubicación. El recurrente contestó que había que cuidarse, porque era una cabrona.[36] La señora Ferrer no precisó la fecha exacta en que escuchó esa conversación, pero enfatizó que se referían a la señora Álvarez. La testigo describió al recurrente como dominante, altanero y burlón y más condescendiente con las mujeres que con los hombres. Según la testigo, el recurrente tenía mucha confianza con las féminas que lo permitían. El recurrente las miraba con deseo y concedía privilegios a algunos empleados sobre los horarios.[37] Además, dijo que el recurrente miraba las mujeres como enamorao' y queriendo tener más que una relación de jefe y empleada. [38]Según la testigo, las muchachas nuevas no hablaban porque tenían miedo.

Durante el contrainterrogatorio, la señora Ferrer reafirmó que escuchó al recurrente decirle cabrona a la señora Álvarez. La testigo dijo que permaneció como a dos o tres pies, para evitar ser incluida en la conversación.[39] La señora Ferrer insistió en que el recurrente

---

[33] Id. pág. 59.
[34] Id. pág. 60.
[35] Id. pág. 87.
[36] Págs. 13 y 52 de la transcripción de Carmen Ferrer.
[37] Id. págs. 17-18.
[38] Id. pág. 24.
[39] Id. pág. 53.

era dominante, altanero y se burlaba de la gente. La testigo admitió que la suspendieron por una querella de ausentismo que el recurrente hizo en su contra, luego de que ella declarara en este caso.[40] Surge de su testimonio que el recurrente hizo la querella en su contra en octubre de 2015 y ella prestó su declaración el 25 de marzo de 2015.[41] A esa fecha la testigo dijo no sabía nada sobre la querella de ausentismo en su contra.[42] Por esa razón, es imposible concluir que declaró contra el recurrente como represalia por la querella de ausentismo. Por último, la señora Ferrer declaró que conocía al recurrente previamente, porque trabajó en la compañía de ambulancia de su hermano y fue despido porque acosaba a las mujeres.[43]

La testigo Ivelisse Rivera Lebrón vio al recurrente invadir el espacio personal de la señora Álvarez, mientras estaba sentada en una camilla. Según la testigo, la víctima se veía incómoda por la situación.[44] La testigo describió al recurrente como un poquito difícil, debido a que hacía comentarios de connotación sexual.[45] La señora Rivera aclaró que no vio al recurrente rozando a la víctima, pero sí bastante cerca para concluir que estaba invadiendo su espacio.[46]

El señor Carlos. A. Pérez Guzmán declaró que presenció cuando el recurrente le dijo a la señora Álvarez que tenía que buscar una amante o un chillo. Ella respondió que era feliz con su gordito en referencia a su esposo. Según el testigo el incidente ocurrió en el año 2014, pero no recordó el día exacto ni el nombre de las otras personas presentes.[47] El señor Pérez declaró que le aconsejó que

---

[40] Id. pág. 59.
[41] Id. pág. 62.
[42] Id. pág. 63.
[43] Id. pág. 66.
[44] Págs.76-77 de la transcripción de la señora Ivelisse Rivera.
[45] Id. pág. 83.
[46] Id. pág. 113.
[47] Págs. 122, 124 de la transcripción del señor Carlos Pérez.

preparara un informe y lo hiciera llegar a la supervisora operacional María J. Colón. Además, le aconsejó que tratara de no estar con él a solas.[48] El testigo describió al recurrente como arrogante y hostil y dijo que a las compañeras de trabajo le molestaban sus comentarios. Según el testigo, el recurrente les decía que eran bonitas y les sobaba el pelo, sin que le hubiesen dado confianza.[49] La representación legal del recurrente intentó minar infructuosamente su credibilidad, porque fue vecino de la señora Álvarez.[50] El testigo fue enfático en que la víctima se sentía hostigada y desmintió que una compañera de trabajo hizo una querella en su contra.[51] Según el testigo fue el recurrente quien instó a la señora Carol Castro a que presentara una querella en su contra.[52]

La señora Suzette Vázquez Algarín declaró sobre el incidente que ocurrió en el ponchador. Según la testigo, el recurrente le preguntó si era pareja de la víctima. La testigo declaró que la señora Álvarez le manifestó que se retiró, porque se sintió molesta y ofendida.[53] La señora Vázquez manifestó que le dijo al recurrente que eso era una falta de respeto y que la pregunta era innecesaria.[54] La representación legal del recurrente intentó establecer sin éxito que su cliente se refirió a una relación de trabajo. No obstante, para la testigo fue claro que se refirió a una relación de pareja.[55] La testigo notificó la situación a Viveca Bosch y a María J. Colón, pero les dijo que no quería revoluces.[56]

Según Vázquez Algarín presenció otro incidente, luego de que el recurrente fue advertido de que tenía que mantenerse en la Base

---

[48] Id. págs. 125-126.
[49] Id. págs. 126–127.
[50] Id. pág. 135.
[51] Id. págs. 142 y 151.
[52] Id. pág. 156.
[53] Págs. 12 y 16 de la transcripción de Suzette Vázquez Algarín.
[54] Id. pág. 13.
[55] Id. pág. 14.
[56] Id. pág. 15.

Adolfo Dones y no podía acercarse a la víctima. Su testimonio fue el siguiente: Josefa la llamó bien nerviosa, porque el recurrente estaba parado frente a su vehículo. La testigo le dijo que se quedara tranquila y no se bajara, porque estaba llegando.[57] Cuando llegó, vio al recurrente parado frente al "bumper" del carro de la víctima, pero se fue rápido porque la reconoció.[58] Josefa se bajó bien nerviosa, comenzó a llorar y dijo que no podía trabajar así.[59] Vázquez Algarín habló de ese incidente con María J. Colón.[60] La testigo dijo que el recurrente iba al lugar donde estaba la víctima y se estacionaba cerca de ella, a pesar de que sabía que no podía acercársele.[61] Las quejas en Recursos Humanos no prosperaron y decidieron acudir a la alcaldía.[62] La señora Vázquez Algarín dijo que se sintió intimidada y nerviosa, porque el recurrente llegaba a sus casos sin solicitar su presencia.[63] Según la testigo, el recurrente empezó con esa conducta, luego de que comenzó el caso de Josefa y a partir de que acudieron a la alcaldía, todo lo que ella hacía estaba mal. Según la testigo, el recurrente tomó medidas disciplinarias en su contra de forma verbal.[64]

María J. Colón Pérez confirmó que los horarios de trabajo los establecía el supervisor de base.[65] Además, de que para el año 2014 -2015, la norma era que los empleados tuvieran un fin de semana libre, luego de cuatro semanas consecutivas de trabajo. La testigo dijo que esa norma fue establecida por la unión. La señora Colón confirmó que la víctima le hizo un acercamiento para que verificara, porque el recurrente no le dio su fin de semana libre. La testigo aclaró que ella únicamente se encargaba del derecho al fin de

---

[57] Id. pág. 17.
[58] Id.
[59] Id. pág. 18.
[60] Id. pág. 19.
[61] Id. pág. 20.
[62] Id. pág. 21.
[63] Id.
[64] Id. págs. 22 y 23 de la transcripción.
[65] Pág. 56 de la transcripción de María J. Colón.

semana libre que tenían los supervisores. Por último, reconoció que a la señora Álvarez le violentaron el derecho a un fin de semana libre.[66]

Los testimonios presentados durante la vista administrativa cumplen a cabalidad con el estándar de prueba clara, robusta y convincente aplicable a los procedimientos disciplinarios. El recurrente no controvirtió los testimonios que evidencian el patrón de hostigamiento sexual en el empleo que cometió contra la señora Álvarez.

Por último, el recurrente alega que la destitución no procede, porque no está contemplado en una primera infracción.

Sus argumentos no son convincentes, ya que, en el propio Reglamento de Conducta y Medidas Disciplinarias de las Normas de Conducta del Municipio, está establecido que dichas normas son unas guías y no camisas de fuerza. No obstante, el Artículo 4.10 *supra,* de dicho reglamento contiene los criterios que deberán evaluarse al momento de imponer la sanción disciplinaria. Algunos de estos criterios son: (1) la gravedad de la falta o violación cometida a las leyes y normas establecidas, (2) los daños causados o que pudo causar, (3) la peligrosidad para la salud, (4) la violación ocurre en horas laborables y dentro de las facilidades del municipio y, (5) si afecta el buen nombre del municipio y sus empleados. La evaluación de estos criterios nos convence de que la destitución del recurrente es más que justificada.

La prueba clara, robusta, convincente y sustancial existente establece que el recurrente incurrió en un patrón constante de hostigamiento sexual contra la señora Josefa Álvarez en las facilidades del municipio y en horas laborables. Las faltas y violaciones cometidas por el recurrente son sumamente graves. El

---

[66] Id. págs. 65, 67, 68 y 70 a 71 de la transcripción.

recurrente obstaculizó con su conducta la labor de la víctima y afectó su salud emocional y física, porque convirtió su área de trabajo en un infierno. El recurrente utilizó y abusó de su función como supervisor para forzar a la señora Álvarez a acceder a sus acercamientos sexuales indeseados. El señor Leduc tomó represalias en su contra por la señora Álvarez negarse a sus acercamientos de índole sexual. El recurrente no le entregó las llaves de su lugar de trabajo, para que tuviera que buscarlas en la oficina y la obligó a trabajar durante un mes consecutivo sin concederle un fin de semana libre. Además, asumió una conducta desafiante e insubordinada, porque continuó hostigando a la víctima, después de que el municipio le advirtió que no podía acercársele. Su proceder causó daños emocionales y mentales a la víctima y puso en riesgo su salud física. La señora Álvarez se vio obligada a ausentarse a su trabajo durante meses, porque según declaró sufría de cáncer. Al momento de acogerse a la licencia por enfermedad, ya había sido víctima de hostigamiento sexual por el recurrente. No obstante, el recurrente continuó hostigándola, cuando se reincorporó a su trabajo y mientras todavía se encontraba recibiendo tratamiento médico para combatir su enfermedad. Los acercamientos sexuales no deseados del recurrente lesionaron la salud emocional de la víctima. La señora Álvarez declaró que se sentía, acosada, nerviosa y atemorizada y mal como mujer por el acoso del recurrente. Su testimonio no fue controvertido.

Sin lugar a duda, la conducta del recurrente afecta el buen nombre del municipio y sus empleados. La prohibición de hostigamiento sexual en el empleo es un asunto de política pública, porque constituye una modalidad del discrimen por sexo y un atentado contra la dignidad de la víctima. El Municipio de San Juan no está exento de cumplir con esa política pública. Los testimonios presentados y controvertidos dejaron claro que el recurrente no solo

hostigaba sexualmente a la señora Álvarez. Su patrón de hostigamiento se extendía a otras subordinadas y que lo hacía aprovechándose de su puesto como supervisor y con la creencia de que era impune.

IV

Por los fundamentos expuestos, se confirma la resolución recurrida.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones